# UNITED STATES DISTRICT COURT

## DISTRICT OF SOUTH DAKOTA

## WESTERN DIVISION

| | |
|---|---|
| JAMES B. DILLON, JR.,<br><br>　　　　　　　Plaintiff,<br><br>　vs.<br><br>CAROLYN W. COLVIN, Acting<br>Commissioner, Social Security<br>Administration,<br><br>　　　　　　　Defendant. | CIV. 15-5034-JLV<br><br><br>ORDER |

Plaintiff James Dillon filed a complaint appealing from an administrative law judge's ("ALJ") decision denying disability insurance benefits.   (Docket 1). Defendant denies plaintiff is entitled to benefits.   (Docket 17).   The court issued a briefing schedule requiring the parties to file a joint statement of material facts ("JSMF").   (Docket 8).   The parties filed their JSMF.   (Docket 13).   For the reasons stated below, plaintiff's motion to reverse the decision of the Commissioner (Docket 16) is granted.

## FACTUAL AND PROCEDURAL HISTORY

The parties' JSMF (Docket 13) is incorporated by reference.   Further recitation of salient facts is incorporated in the discussion section of this order.

On February 12, 2010, Mr. Dillon filed an application for disability insurance ("DIB") benefits under Title II.   (Docket 13 ¶ 1).   The application alleged a disability beginning February 3, 2009, and a last insured date of December 31, 2009.   Id.   On November 21, 2013, the ALJ issued a decision

finding Mr. Dillon was not disabled.   Id. ¶ 3; see also Administrative Record at pp. 11-27 (hereinafter "AR at p. ___").   On March 3, 2015, the Appeals Council denied Mr. Dillon's request for review and affirmed the ALJ's decision. (Docket 13 ¶ 3).   The ALJ's decision constitutes the final decision of the Commissioner of the Social Security Administration.   It is from this decision which Mr. Dillon timely appeals.

The issue before the court is whether the ALJ's decision of November 21, 2013, that Mr. Dillon was not "under a disability, as defined in the Social Security Act, at any time from February 3, 2009, . . . through December 31, 2009," is supported by substantial evidence in the record as a whole.   (AR at p. 27) (bold omitted); see also Howard v. Massanari, 255 F.3d 577, 580 (8th Cir. 2001) ("By statute, the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive.") (internal quotation marks and brackets omitted) (citing 42 U.S.C. § 405(g)).

## STANDARD OF REVIEW

The Commissioner's findings must be upheld if they are supported by substantial evidence in the record as a whole.   42 U.S.C. § 405(g); Choate v. Barnhart, 457 F.3d 865, 869 (8th Cir. 2006); Howard, 255 F.3d at 580.   The court reviews the Commissioner's decision to determine if an error of law was committed.   Smith v. Sullivan, 982 F.2d 308, 311 (8th Cir. 1992).   "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion."   Cox v. Barnhart, 471 F.3d 902, 906 (8th Cir. 2006) (internal citation and quotation marks omitted).

The review of a decision to deny benefits is "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision . . . [the court must also] take into account whatever in the record fairly detracts from that decision."   Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (quoting Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001)).

It is not the role of the court to re-weigh the evidence and, even if this court would decide the case differently, it cannot reverse the Commissioner's decision if that decision is supported by good reason and is based on substantial evidence.   Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005).   A reviewing court may not reverse the Commissioner's decision " 'merely because substantial evidence would have supported an opposite decision.' "   Reed, 399 F.3d at 920 (quoting Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995)). Issues of law are reviewed *de novo* with deference given to the Commissioner's construction of the Social Security Act.   See Smith, 982 F.2d at 311.

The Social Security Administration established a five-step sequential evaluation process for determining whether an individual is disabled and entitled to DIB benefits under Title II or SSI benefits under Title XVI.   20 CFR §§ 404.1520(a) and 416.920(a).[1]   If the ALJ determines a claimant is not

---

[1]The criteria under 20 CFR § 416.920 are the same under 20 CFR § 404.1520.   Boyd v. Sullivan, 960 F.2d 733, 735 (8th Cir. 1992).   All further references will be to the regulations governing DIB benefits, unless otherwise specifically indicated.

disabled at any step of the process, the evaluation does not proceed to the next step as the claimant is not disabled.   Id.   The five-step sequential evaluation process is:

> (1) whether the claimant is presently engaged in a "substantial gainful activity"; (2) whether the claimant has a severe impairment—one that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education, and work experience); (4) whether the claimant has the residual functional capacity to perform . . . past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove there are other jobs in the national economy the claimant can perform.

Baker v. Apfel, 159 F.3d 1140, 1143-44 (8th Cir. 1998).   The ALJ applied the five-step sequential evaluation required by the Social Security Administration regulations.   (AR at pp. 12-13).

**STEP ONE**

At step one the ALJ determined Mr. Dillon last met the insured status requirements of Title II on December 31, 2009.   (AR at p. 14).   With this finding, the relevant time period is February 3, 2009, through December 31, 2009.   Id. After his alleged onset date, Mr. Dillon worked as a hotel clerk from May 1, 2009, to October 3, 2009.   Id.   "The agency . . . determined that this was an unsuccessful work attempt, as the work 'was done during a period of remission and ended due to his DIB.'"   Id.   The ALJ found Mr. Dillon had not been engaged in substantial gainful activity during the period February 3, 2009, through December 31, 2009.   Id.

4

## STEP TWO

"At the second step, [the agency] consider[s] the medical severity of your impairment(s)."   20 CFR § 404.1520(a)(4)(ii).   "It is the claimant's burden to establish that [her] impairment or combination of impairments are severe." Kirby v. Astrue, 500 F.3d 705, 707 (8th Cir. 2007).   A severe impairment is defined as one which significantly limits a physical or mental ability to do basic work activities.   20 CFR § 404.1521.   An impairment is not severe, however, if it "amounts to only a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities."   Kirby, 500 F.3d at 707.   "If the impairment would have no more than a minimal effect on the claimant's ability to work, then it does not satisfy the requirement of step two."   Id. (citation omitted).   Additionally, the impairment must have lasted at least twelve months or be expected to result in death.   See 20 CFR § 404.1509.

The ALJ found Mr. Dillon suffered from the following severe impairments: "bi-polar disorder;[2] anxiety disorder[3] with panic; impulse control disorder; diabetes mellitus; recurrent deep vein thrombosis; lumbar degenerative disease; sleep apnea."   (AR at p. 14) (bold omitted).

---

[2]Bipolar disorder, formerly called "manic depression," is a chronic condition involving mood swings with at least one episode of mania and repeated episodes of depression.   MedicineNet.com.

[3]Anxiety disorder is a chronic condition characterized by an excessive and persistent sense of apprehension with physical symptoms such as sweating, palpitations, and feelings of stress.   It included agoraphobia and panic disorders.   MedicineNet.com.

5

**STEP THREE**

At step three, the ALJ determines whether claimant's impairment or combination of impairments meets or medically equals the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 ("Appendix 1"). 20 CFR §§ 404.1520(d), 404.1525, and 404.1526.   If a claimant's impairment or combination of impairments meets or medically equals the criteria for one of the impairments listed and meets the duration requirement of 20 CFR § 404.1509, the claimant is considered disabled.   A claimant has the burden of proving an impairment or combination of impairments meet or equals a listing within Appendix 1.   Johnson v. Barnhart, 390 F.3d 1067, 1070 (8th Cir. 2004).   If a claimant's impairment or combination of impairments meets or medically equals the criteria for one of the impairments listed and meets the duration requirement of 20 CFR § 404.1509, claimant is considered disabled.   If not covered by these criteria, the analysis is not over, and the ALJ proceeds to the next step.

At step three, the ALJ found Mr. Dillon's severe impairments did not qualify either individually or collectively to meet or equal a listing under Appendix 1.   (AR at p. 15).   Mr. Dillon challenges this finding as it relates to his severe disability, deep vein thrombosis ("DVT"), under Listing 4.11.   (Docket 16 at p. 12).   Although the ALJ referenced Listing 4.00 relating to cardiovascular impairments, he did not specifically address Listing 4.11.   See AR at pp. 15-17. Rather, the ALJ simply included this Listing in the finding "[a]fter careful review of the medical record, the undersigned finds that his impairments do not equal the severity of any impairment described in those sections of the Listing of lmpairments."   Id. at p. 15.

6

Listing 4.0 considers impairments to the cardiovascular system. (Appendix 1 at 4.0).   "Disorders of the veins . . . may cause impairments of the lower extremities (peripheral vascular disease) . . . . [The agency] will evaluate peripheral vascular disease under 4.11 or 4.12 . . . ."   Id. at 4.0A(1.1)(c). Peripheral vascular disease[4] to qualify under Listing 4.0 requires:

> Chronic venous insufficiency of a lower extremity with incompetency or obstruction of the deep venous system and one of the following:
>
> > A.   Extensive brawny edema[5] . . . involving at least two-thirds of the leg between the ankle and knee or the distal one-third of the lower extremity between the ankle and hip.
> >
> > OR
> >
> > B.   Superficial varicosities, stasis dermatitis, and either recurrent ulceration or persistent ulceration that has not healed following at least 3 months of prescribed treatment.

Id. at 4.11.

---

[4]"Peripheral vascular disease (PVD) . . . is any impairment that affects either the arteries (peripheral arterial disease) or the veins (venous insufficiency) in the extremities, particularly the lower extremities.   The usual effect is blockage of the flow of blood either from the heart (arterial) or back to the heart (venous).   If you have peripheral arterial disease, you may have pain in your calf after walking a distance that goes away when you rest (intermittent claudication); at more advanced stages, you may have pain in your calf at rest or you may develop ulceration or gangrene.   If you have venous insufficiency, you may have swelling, varicose veins, skin pigmentation changes, or skin ulceration."   Appendix 1 § 4.00(G)(1).

[5]"Brawny edema (4.11A) is swelling that is usually dense and feels firm due to the presence of increased connective tissue; it is also associated with characteristic skin pigmentation changes.   It is not the same thing as pitting edema.   Brawny edema generally does not pit (indent on pressure), and the terms are not interchangeable.   Pitting edema does not satisfy the requirements of 4.11A."   Appendix 1 § 4.00(G)(3).

7

Mr. Dillon argues on December 4, 2008, his chart noted DVT and edema.   (Docket 16 at p. 14) (referencing (Docket 13 ¶ 92) ("firm swelling of the right lower extremity to the knee and a mottling of the entire mid-calf to the ankle.").   He asserts that just outside the December 31, 2009, coverage period on January 21, 2010, his emergency room record charts "moderate skin changes, consistent with chronic venous insufficiency are present in the distal two-thirds of the leg."   Id. (referencing Docket 13 ¶ 151).

While the December 2008 record of "firm swelling" may qualify as brawny edema from the right ankle to the knee, the January 2010 record does not.   During the insured period of February 13, 2009, through the end of the year, Mr. Dillon's medical records reflect either "no edema," edema of an unspecified nature, or pitting edema evidenced by charting of "1+ edema." See AR at pp. 743-44, 753, 768, 773, 780-82, 785, 787 and 818-19.   Mr. Dillon fails to satisfy his burden of proving his condition meets or equals a listing within Appendix 1.   Johnson, 390 F.3d at 1070.

### **STEP FOUR**

Before considering step four of the evaluation process, the ALJ is required to determine a claimant's residual functional capacity ("RFC"). 20 CFR § 404.1520(e).   RFC is a claimant's ability to do physical and mental work activities on a sustained basis despite any limitations from his impairments.   20 CFR § 404.1545(a)(1).   In making this finding, the ALJ must consider all of the claimant's impairments, including those which are not severe.

8

20 CFR § 404.1545(e).   All of the relevant medical and non-medical evidence in the record must be considered.   20 CFR §§ 404.1520(e) and 404.1545.

"The ALJ should determine a claimant's RFC based on all the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations." Lacroix v. Barnhart, 465 F.3d 881, 887 (8th Cir. 2006) (quoting Strongson v. Barnhart, 361 F.3d 1066, 1070 (8th Cir. 2004)); see also Cox, 495 F.3d at 619 (because RFC is a medical question, the ALJ's decision must be supported by some medical evidence of a claimant's ability to function in the workplace, but the ALJ may consider non-medical evidence as well); Guilliams, 393 F.3d at 803 ("RFC is a medical question, and an ALJ's finding must be supported by some medical evidence.").   The ALJ "still 'bears the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence.' "   Id. (quoting Roberts v. Apfel, 222 F.3d 466, 469 (8th Cir. 2000)).

"In determining RFC, the ALJ must consider the effects of the combination of both physical and mental impairments."   Stormo v. Barnhart, 377 F.3d 801, 807 (8th Cir. 2004) (citing Baldwin v. Barnhart, 349 F.3d 549, 556 (8th Cir. 2003)).   As stated earlier in this discussion, a severe impairment is one which significantly limits an individual's physical or mental ability to do basic work activities.   20 CFR § 404.1521(a).

The ALJ developed the following RFC for Mr. Dillon:

> [T]he claimant had the residual functional capacity to lift and/or carry 20 pounds occasionally and 10 pounds frequently, stand and/or walk (with normal breaks) for at least 2 hours in an 8-hour workday—i.e., walk and stand for 4 hours a day, sit (with normal breaks) for a total of about 6 hours in an 8-hour workday, was unlimited in push and/or pull activities (including operation of hand and/or foot controls) other than as stated for lift and/or carry, occasionally climb ramps and stairs but should not be required to climb ladders, ropes or scaffolds, occasionally balance, stoop, kneel, crouch and crawl, should avoid concentrated exposure to hazards (machinery, heights, etc.), and the claimant could understand, remember and carry out two to three step instructions; the claimant could respond appropriately to supervision, co-workers, and the public on an occasional basis; within the foregoing parameters, the claimant could make work-related judgments in a routine work setting; and within the foregoing parameters, the claimant could respond appropriately to work situations and changes in a typical work setting.

(AR at pp. 17-18).   In arriving at this RFC, the ALJ found:

> While the claimant may have pain symptoms, the important question is the severity of the pain, and after considering the claimant's statements, the medical history provided from treating and examining doctors, and viewing the objective medical evidence in the most favorable light to the claimant, it is concluded that the claimant is not as restricted as he alleges.   In light of his statements that he takes no prescribed pain medication, the undersigned finds this inconsistent with his allegations of severe, disabling pain symptoms, which further reduces his credibility.
>
> Furthermore, the claimant had not received the type of medical treatment one would expect for a totally disabled individual, with the record revealing infrequent trips to the doctor in 2009, and even shortly thereafter, with significant gaps in the claimant's history of treatment, for treatment that has been essentially routine and/or conservative in nature, with those records not supporting the claimant's alleged symptoms and limitations.

Id. at p. 19.

Although the agency labeled Mr. Dillon's effort as a hotel clerk during five months in 2009 as a "unsuccessful work attempt," the ALJ used this work attempt as evidence "suggest[ing] a capacity for significant functioning in 2009." AR at p. 20 (referencing AR at pp. 392-99).   Despite Mr. Dillon's testimony during the hearing that he "could 'only lift 10 pounds at most, but he is able to lift his 18 pound baby with some difficulty,' " the ALJ adopted Mr. Dillon's work report that he "carr[ied] hotel refrigerators to hotel rooms . . . ." to support his conclusion.   Id.

The ALJ found Mr. Dillon's statement he was unable to work without pain to be inconsistent with the medical history provided by the treating and examining physicians.   Id. at p. 19.   The ALJ also found Mr. Dillon "had not received the type of medical treatment one would expect for a totally disabled individual, with the record revealing infrequent trips to the doctor in 2009, and even shortly thereafter, with significant gaps in the claimant's history of treatment, for treatment that has been essentially routine and/or conservative in nature, with those records not supporting the claimant's alleged symptoms and limitations."   Id.

The ALJ determines the weight attributable to a claimant's subjective complaints, including pain, according to the framework created in Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).   Five Polaski factors guide the ALJ's credibility determination: "1) the claimant's daily activities; 2) the

11

duration, frequency, and intensity of the pain; 3) the dosage, effectiveness, and side effects of medication; 4) precipitating and aggravating factors; and 5) functional restrictions." Choate, 457 F.3d at 871.   The ALJ need not mechanically discuss each of the Polaski factors.   See Goff v. Barnhart, 421 F.3d 785, 791 (8th Cir. 2005).   Although the ALJ can discount a claimant's subjective complaints for inconsistencies within the record as a whole, "the ALJ must make express credibility findings and explain the record inconsistencies that support those findings." Dolph, 308 F.3d at 879.   The court will not disturb the decision of an ALJ who seriously considers but for good reason expressly discredits a claimant's subjective complaints.   See Haggard, 175 F.3d at 594.

Mr. Dillon's statements must be taken in context.   During an Urgent Care Clinic examination on February 13, 2009, Mr. Dillon was experiencing pain in his right leg " 'like it is going to explode' especially when walking."   (Docket 13 ¶110).   Because of his condition, Mr. Dillon was hospitalized for four days.   Id. During the hospitalization he was in bedrest with his legs elevated.   Id.   On February 17 at discharge "he had no complaints of pain and only slight discomfort when walking."   Id.

Mr. Dillon presented to the Veterans Administration ("VA") clinic on February 24, 2009, with continued right leg complications after being on his feet too much.   Id. ¶ 111.   Dr. Schwarzenbach noted "some swelling in his right leg and redness."   Id. ¶ 112.   While Mr. Dillon wanted to return to work, the doctor

12

kept him out of work for a week and upon returning to work "he is not to . . . stand or sit more than 30 to 60 minutes. . . . [and] gradually increase activity as he tolerates."   Id.

On March 18, 2009, Mr. Dillon "returned to the VA reporting that he continued to try and remain off his leg as much as possible" after his mid-February hospitalization for DVT.   Id. ¶ 118.   During the examination Dr. Kaplan found Mr. Dillon's "gait was normal, his reflexes were symmetrical, and his extremities were unremarkable."   Id. ¶ 120.

On May 11, 2009, Dr. Kaplan saw Mr. Dillon for "right leg pain."   Id. ¶ 125.   Mr. Dillon "had a swollen right calf" with a continuing diagnosis of "DVT right lower extremity."   Id.   Because his TED[6] hose had worn out, Mr. Dillon called the clinic on July 30, 2009, and requested a new pair.   Id. ¶ 133.   On August 17, 2009, Mr. Dillon reported to the medical staff that "elevating his legs helped relieve his pain."   Id. ¶ 138.

While Mr. Dillon's 2010 medical records cannot be used to create a qualification for benefits, they are consistent with and confirm the nature and quality of his 2009 health.   "[M]edical evidence of a claimant's condition subsequent to the expiration of the claimant's insured status is relevant evidence because it may bear upon the severity of the claimant's condition before the

---

[6]TED hose are compression stockings "used to treat swelling in the legs and ankles, varicose veins, and spider veins.   TED hose may help to prevent the progression of serious vein problems and diseases."   (Docket 13 at p. 36 n.2).

expiration of his . . . insured status."   <u>Basinger v. Heckler</u>, 725 F.2d 1166, 1169 (8th Cir. 1984).

On January 21, 2010, Mr. Dillon reported to the VA clinic with "noted moderate skin changes, consistent with chronic venous insufficiency are present in the distal two-thirds of the leg."   <u>Id.</u> ¶ 151.   Because of a diagnosis of "probable venous thrombosis," he was admitted to the VA hospital in Hot Springs.   <u>Id.</u>   Throughout the hospitalization, Mr. Dillon's care plan included keeping his lower extremity elevated.   <u>See id</u> ¶¶ 153, 155, 157-58.   Upon discharge on January 25, his condition was "improved."   <u>Id.</u> ¶ 160.

Throughout the year 2009, Mr. Dillon had a number of mental health consultations.   <u>See id.</u> ¶ 126, 141,147, 149.   These consultations shared a common theme.   Mr. Dillon was observed to be "irritable with angry outbursts, impulsive, swearing, yelling and demanding. . . . his observed affect . . . [is] constricted . . . . decreased concentration. . . . [and] thought [process] was positive for obsessions/compulsions."   <u>Id.</u> ¶ 126.   <u>Compare id.</u> ¶¶ 147 (same) and 149 (same).

The ALJ makes an unfair characterization of Mr. Dillon's work report. Mr. Dillon actually reported he carried "small refrigerators from the store room to guest rooms.   Carried item 10 to 50 feet, 3-4 times a week," and these weighed at most 25 pounds.   (AR at p. 393).   The work report noted that the "weight . . . frequently lifted . . . [1/3 to 2/3 of the workday] . . . [was] less than 10 pounds." <u>Id.</u>

14

In judging Mr. Dillon's credibility, the ALJ chose to give little weight to Mr.

Dillon's wife's testimony.   The ALJ declared:

> While the undersigned acknowledges Mrs. Dillon as a well-meaning individual trying to help her husband obtain benefits, her testimony does not establish that the claimant is disabled.   Since Mrs. Dillon is not medically trained to make exacting observations as to dates, frequencies, types and degrees of medical signs and symptoms, or of the frequency or intensity of unusual moods or mannerisms, the accuracy of the testimony is questionable.   Moreover, by virtue of the relationship as the claimant's wife, Mrs. Dillon cannot be considered a disinterested third party whose testimony would not tend to be colored by affection for the claimant and a natural tendency to agree with the symptoms and limitations the claimant alleges.   Most importantly, significant weight cannot be given to Mrs. Dillon testimony because it, like the claimant's, is simply not consistent with the preponderance of the opinions and observations by medical doctors in this case.

Id. at p. 25.

The court notes that family members "always have a stake in the claim"

because it is their child, spouse or other family member who is seeking Social

Security benefits.   If this relationship was a valid basis for rejecting the

testimony of a family member, the regulations would specifically direct an ALJ to

disregard the statements and observations of these individuals.   To the

contrary, the regulations encourage an ALJ to seek the testimony of family

members because they have the most frequent contact and exposure to the

claimant's physical and mental impairments.   See 20 CFR §§ 404.1512(b)(1)(iii)

("Evidence includes . . . [s]tatements . . . others make about your impairment(s),

your restrictions, your daily activities, your efforts to work, or any other

statements you make to medical sources during the course of examination or

15

treatment, or to us during interviews, on applications, in letters, and in testimony in our administrative proceedings . . . .") and 404.1513(d)(4) ("In addition to evidence from the acceptable medical sources . . . . we may also use evidence from other sources to show the severity of your impairment(s) and how it affects your ability to work.   Other sources include, but are not limited to . . . . Other non-medical sources (for example, spouses, parents and other caregivers, siblings, other relatives, friends, neighbors, and clergy). . . .").   Consideration of third party statements also must be considered when an ALJ is evaluating a claimant's pain.   See 20 CFR § 404.1529(a).   That regulation provides:

> In determining whether you are disabled, we consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence . . . . These include statements or reports from . . . others about your medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how your impairment(s) and any related symptoms affect your ability to work.

Id.

Mrs. Dillon provided both a letter and oral testimony for the ALJ's consideration.   The letter included the following observations while her husband was working as assistant manager at Family Dollar:

> He struggled not long into it.   His feet could not handle being on the cement floor all the time if he stood to [sic] long in one position the blood would pool and he would come home swollen and sore.
>
> He complained that the others didn't listen to him and he was always stressed.   He . . . was very short tempered with everyone

16

> . . . . He couldn't accomplish much at home because he sunk into a
> deep depression and became pretty unreachable. . . .
>
> He went to the doctors when the manager got back and he was very
> angry when they had to put him into the hospital.   The doctor said
> he needed a different job where he could put his feet up.   When
> Family Dollar laid him off he was very angry and went into a deeper
> depression.

(Docket 13 ¶ 50).   Her husband's condition did not change when he went to

work as a motel clerk.

> [A]t first it was better but then the same things started happening
> again.   He started to stress. . . . his feet were still swelling and he
> had a hard time staying awake.   He was very defensive and not
> willing to take care of himself because he didn't want to seem ill or
> unable to do the job. . . .
>
> I would like a chance to answer any questions you might have or to
> explain this to you in person.   My husband has been in a vicious
> cycle between complications from his DVT and diabetes and his
> bipolar.   It seems that if he has problems with his physical
> condition he has so much more trouble stabilizing his mental
> condition and vice versa. . . .

Id.

     Mrs. Dillon testified at the November 9, 2011, administrative hearing.

She testified about what she personally observed while her husband was working

at Family Dollar during 2007-2009.   (Docket 13 ¶ 52).

> [When he started] he was very happy to have . . . an active job where
> he was able to be more physical, and for a while there he enjoyed it,
> and then slowly but surely he started to get quieter. . . . He would
> come home and . . . his left leg would be extremely swollen so he
> would have to prop it up, and the doctors kept telling him because I
> would go to the doctor's appointments, and they said you have to
> keep that leg elevated as much as possible.   So he would come
> home, and he would do it.   He would keep it as elevated as he could,
> and when he was home I noticed that he had a harder time following
> through. . . .

17

> I noticed that when he would talk about work, as much as he had enjoyed it in the beginning, it started to get harder because he would say that because he was bipolar that they would particularly single him out, and he felt that they weren't happy with him because of that. . . .
>
> And when he finally got worse we noticed that he was getting an ulcer on his leg and for about a week I kept telling him you've got to go see the doctor, and he kept saying I can't do that.   If I take off . . . I'm going to lose my job . . . .
>
> Well, by the time we finally went into see the doctor they put him in the hospital, and it was extremely severe, and he kept telling them I've got to get back. . . .
>
> He got back and . . . he was in a severe cycle of depression, and a very, very hard time focusing, and couldn't finish jobs that were given to him. . . .

Id.

Regarding her husband's employment as a motel clerk in 2009, Mrs.

Dillon testified:

> [T]his is going to be great.   He can keep his feet up a little bit more. He is not going to be standing the entire time . . . it did start out well. . . .
>
> [S]lowly but, surely, he went into the depression again.   He was coming home and staying up late.   His legs were still swollen . . . [and] ended up in trouble because he would get a blood clot in his legs, and he was more grumpy, and more edgy at home. . . . He didn't tell me a lot about what was going on at work.

Id.   She testified her husband "would go through depression, neglect himself,

neglect portions of his job and it made it very hard for him to accomplish any one

task at home, much less hold a job.   Dillon got to where he didn't deal with

people very well, and he isolated himself."   Id. ¶ 56.

Failure to consider Mrs. Dillon's testimony is contrary to the regulations. 20 CFR §§ 404.512(b)(1)(iii), 404.1513(d)(4), and 404.1529(a).   The conclusion to give her letter and testimony little or no weight is not supported by substantial evidence and the ALJ did not provide good reasons for discounting the testimony.

Mrs. Dillon's testimony is consistent with the medical records of her husband's treating health providers and with his testimony.   Conditions such as DVT, bipolar disorder and anxiety disorder are conditions commonly known to wax and wane.   It is not unexpected for an individual with these conditions to appear and act healthy, while at other times to suffer from the extreme, debilitating problems these physical and mental conditions cause.   See Nowling v. Colvin, 813 F.3d 1110, 1123 (8th Cir. 2016) ("the ALJ improperly accorded great weight to [those] statements . . . indicating that Nowling demonstrated 'improvement' without acknowledging that Nowling's symptoms waxed and waned throughout the substantial period of treatment [and] without acknowledging the unpredictable and sporadic nature of Nowling's symptoms . . . .").

Prior to December 2009, Mr. Dillon was receiving VA benefits for his bipolar condition.   (Docket 13 ¶ 5).   In December he applied for and received an increase in benefits.   Id.   On December 10, 2009, Mr. Dillon's VA disability benefits increased from 70 percent to 100 percent.   Id. ¶¶ 5-6.   Among Mr. Dillon's eleven service-connected diagnoses were "bipolar disorder" and "right leg deep vein thrombosis."   Id. ¶ 7.   In addition to finding Mr. Dillon 100 percent

19

disabled, the VA determined he was entitled to special compensation because he met the VA criteria of "housebound."[7]   Id. ¶ 5.   The ALJ did not reference the VA disability decision in his denial of benefits to Mr. Dillon.   Id. ¶ 6.

The regulations make clear a VA disability decision is not binding on the Social Security Administration.   "A decision by any . . . other governmental agency about whether you are disabled . . . is based on its rules and is not our decision about whether you are disabled . . . . [The agency] must make a disability . . . determination based on social security law. Therefore, a determination made by another agency that you are disabled . . . is not binding on [the Social Security Administration]."   20 CFR § 404.1504. Despite this caveat, the regulations also make clear the other agency decision must be considered by an ALJ.   "Evidence includes . . . [d[ecisions by any governmental . . . agency about whether or not you are disabled . . . ."   Id. at § 404.1512(b)(1)(v).

The Commissioner acknowledges "[a]n ALJ must consider and may not ignore a VA finding of disability."   (Docket 17 at p. 11) (referencing Morrison v. Apfel, 146 F.3d 625, 628 (8th Cir. 1998)).   The Commissioner argues the ALJ's failure to address the VA benefits ruling is not error because "the ALJ considered

---

[7]"The term 'permanently housebound' is . . . defined as being 'substantially confined to such veteran's house . . . or immediate premises due to a service-connected disability or disabilities which it is reasonably certain will continue through the veteran's lifetime.' "   Howell v. Nicholson, 19 Vet. App. 535, *4 (2006) (citing 38 CFR §3.350(i)(2)).   The term is also "intended to provide additional compensation for veterans who [are] unable to overcome their particular disabilities and leave the house in order to earn an income as opposed to an inability to leave the house at all."   Id. (emphasis in original).

the medical evidence from the VA throughout his decision." Id. (referencing Pelkey v. Barnhart, 433 F.3d 575 (8th Cir. 2006)).   The Commissioner also argues Dr. Pelc, a consulting clinical psychologist, considered the VA records and the ALJ "gave his opinion substantial weight."   (Docket 17 at p. 12).   For these reasons, the Commissioner asserts "the ALJ properly discussed the evidence underlying the VA disability rating."   Id.

While Dr. Pelc may have reviewed Mr. Dillon's VA records, he considered only Mr. Dillon's mental and psychological impairments and did not consider the impact of any physical limitations in arriving at his conclusions.   (Docket 13 ¶ 212).   Dr. Pelc did not discuss the VA disability rating or how DVT impacted Mr. Dillon.   The Commissioner's attempt to boot-strap Dr. Pelc's review of the VA records into the argument that the ALJ properly considered those records is without merit.[8]

In Pelkey, the ALJ did not specifically reference the claimant's "60 percent figure," but "he fully considered the evidence underlying the VA's final conclusion that Pelkey was 60 percent disabled."   Pelkey, 433 F.3d at 579. Additionally, the ALJ in Pelkey "discussed the rating examination," the VA physician's diagnosis, and the earlier VA award of benefits based on a "20 percent disability."   Id.   The court rejected Pelkey's argument the ALJ failed to

---

[8]Dr. Thomas Atkins, a second consulting clinical psychologist relied upon by the ALJ, testified his opinions about Mr. Dillon were based only on his mental health limitations and were without consideration of his physical limitations. (Docket 13 ¶ 197).   The only reference to the VA decision was that Dr. Atkins agreed Mr. Dillon's bipolar condition would tend to cause him to isolate himself and avoid social situations.   Id. ¶ 196.

follow § 404.1512(b)(1)(v) and <u>Morrison</u> because "the ALJ did not ignore the VA rating but considered and discussed the underlying medical evidence contained in the VA's Rating Decision."  <u>Id.</u> at pp. 579-80.   Other courts have concluded the ALJ does not err by considering the claimant's medical history and the VA physician's opinion upon which the VA disability decision is based.   <u>See</u> <u>Baker v. Colvin</u>, 620 F. App'x 550, 556 (8th Cir. 2015) (the ALJ considered the medical history and the VA physician's opinion); <u>DuBois v. Barnhart</u>, 137 F. App'x 920, 921 (8th Cir. 2005) (same).

While the ALJ may have considered the VA's medical records, there is no evidence he examined the rating examination, the VA disability assessment or the VA determination that Mr. Dillon was 100 percent disabled.   <u>Morrison</u> required the ALJ do to more than simply review the same records which the VA considered.   "[T]he ALJ should have addressed the determination by the VA that [claimant] is permanently and totally disabled.   It is true that the ALJ does not have to discuss every piece of evidence presented . . . . We think, however, that the VA finding was important enough to deserve <u>explicit attention</u>."   <u>Morrison</u>, 146 F.3d at 628 (internal citations and quotation marks omitted) (emphasis added).   <u>See</u> <u>also</u> <u>Hensley v. Colvin</u>, No. 15-2829, 2016 WL 3878219, at *6 (8th Cir. July 18, 2016) ("the ALJ explicitly acknowledged the VA's disability finding"); <u>Rodewald v. Astrue</u>, 455 F. App'x 725, 726 (8th Cir. 2012) ("the ALJ considered and discussed the 100% disability rating of the Department of Veterans Affairs") (referencing <u>Morrison</u>, 146 F.3d at 628); <u>Curtis v. Astrue</u>, 338 F. App'x 554, 555

(8th Cir. 2009) ("the ALJ specifically acknowledged the VA decision, which was based on records not before the ALJ and which, according to the VA decision, conflicted with the examination findings in the record at issue here"); Lewis v. Barnhart, 76 F. App'x 756, 757 (8th Cir. 2003) ("the ALJ referenced Lewis's VA disability status in his opinion"); Walker v. Barnhart, 50 F. App'x 799, 800 (8th Cir. 2002) ("the ALJ adequately weighed the Department of Veterans Affairs' disability determination").   The ALJ erred by failing to comply with the obligation to discuss and weigh the VA disability determination.   20 CFR § 404.1512(b)(1)(v); Morrison, supra.

In challenging the ALJ's RFC, Mr. Dillon argues the ALJ erred by rejecting the opinion of Dr. Kaplan.   (Docket 16 at p. 25).   As Mr. Dillon's treating physician, Dr. Kaplan opined his patient needed to elevate his legs periodically throughout the work day.   (Docket 13 ¶ 221).   Dr. Kaplan believed his opinion was consistent with his patient's medical condition and was medically necessary in 2009.   Id.   The ALJ rejected Dr. Kaplan's opinion because it came in the form of a "pre-arranged statement" and was "precipitated" by Mr. Dillon's attorney. (AR at p. 25).

The background for the use of the letter is relevant to the analysis of the ALJ's rejection of Dr. Kaplan's opinion.   When Mr. Dillon's attorney asked Dr. Kaplan to complete a medical source statement concerning his patient's medical conditions and how they impacted functional capacity, the VA responded that it

23

did not "complete forms for attorneys."   (Docket 13 ¶ 221).   When notified of this situation, the ALJ did not obtain information from Dr. Kaplan directly.   Id.

Once the ALJ examined the record and concluded a medical source statement had not been received from Dr. Kaplan, it became the ALJ's responsibility to "develop the record fairly and fully, independent of the claimant's burden to press his case."   Snead v. Barthart, 360 F.3d 834, 838 (8th Cir. 2004).   While Mr. Dillon bore the burden of persuasion, the ALJ was responsible for development of the record.   Id.   Here the ALJ's failure to develop the record is both unfair and prejudicial.

Seeking to obtain a clarification from Dr. Kaplan, Mr. Dillon's attorney sent the doctor a "fill in the blank questionnaire."   The pertinent text of the questionnaire stated:

> I am requesting . . . that you address one issue in this case that I believe is significant to Mr. Dillon's disability.   Mr. Dillon testified that as a result of his medical conditions, that he needs to elevate his legs periodically throughout the day or his legs will swell and become significantly painful and he has as well developed ulcers in the past when he wasn't able to elevate his legs when needed.
>
> My questions to you are as follows:
>
> 1.   Is Mr. Dillon's need to elevate his legs above his waist level as he testified periodically throughout the day to avoid increased swelling, consistent with his medical condition for which you are treating him for? _____Yes  _____ No
>
> 2.   In the calendar year 2009, do you believe that it was medically necessary for Mr. Dillon to help control his symptoms and his swelling by elevating his legs above his waist level periodically throughout the day as needed?  _____ Yes  _____ No

24

(AR at pp. 1523-24).   Dr. Kaplan checked both "yes" options, dated and signed the letter at the place indicated for his signature.   Id.   If the ALJ was unwilling to consider Dr. Kaplan's opinions in this format, it was the ALJ's obligation to have the doctor complete a medical source statement.   Snead, 360 F.3d at 838.

The ALJ went on and rejected Dr. Kaplan's opinions because Mr. Dillon "fail[ed] to make such allegation, and medical treatment records for the time period relevant to this matter fail to support such a need . . . for such symptoms." (AR at p. 25).   The ALJ's conclusion is contrary to the overwhelming evidence in the record.   The medical records repeatedly include treatment involving elevation of Mr. Dillon's legs and he was frequently instructed to elevate his legs whenever possible.   See Docket 13 ¶¶ 60-61, 64, 97-98, 100, 103, 108, 110, 138, 153, 155 & 158.

Because Dr. Kaplan's opinion is entitled to controlling weight, the ALJ's RFC which did not incorporate the doctor's opinions is not supported by substantial evidence.   42 U.S.C. § 405(g); Choate, 457 F.3d at 869; Howard, 255 F.3d at 580.   The ALJ did not complete a proper analysis of Mr. Dillon's RFC at step four.   Mr. Dillon's testimony he had to elevate his right leg 5-6 times a day for 10-15 minutes is consistent with his DVT health education, his hospital care, and the instructions of his doctors before, during and after the insured period. Mr. Dillon satisfied the burden of persuasion to demonstrate that his RFC must include a proviso that he be allowed to elevate his legs above his heart 5-6 times for 10-15 minutes per day.   Stormo, 377 F.3d at 806.

Remand to permit the ALJ to complete the step four analysis would normally be in order.   But using the ALJ's RFC with the additional proviso that Mr. Dillon must elevate his legs about his heart 5-6 times for 10-15 minutes per day makes remand on this point unnecessary.

**STEP FIVE**

The "burden of production shifts to the Commissioner at step five."   Id. The ALJ found Mr. Dillon was unable to return to his past relevant work as a hotel desk clerk.   (AR at pp. 25-26).   The ALJ found Mr. Dillon retained a RFC "to perform the full range of light work[9] . . . ."   Id. at p. 26.

The ALJ ultimately chose to reject Mr. Dillon's need to elevate his legs throughout the day, because "even [if] such a need [existed] . . . [the need] would not result in a finding of 'disabled.'"   (AR at p. 25).   This conclusion is contrary to the testimony of the vocational expert, Jerry Gravatt.   Mr. Gravatt testified that for each of the positions he identified as being available with the RFC found by the ALJ—"jewelry preparer"; "bench hand, small products or jewelry industry"; and "assembler, small products"—would not allow an individual to recline with their feet above chest level.   (Docket 13 ¶¶ 228-29).   Mr. Gravatt

---

[9]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.   Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.   To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.   If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567(b).

testified the individual would "have to be able to sit in a normal work chair or work setting with the legs elevated to that level." Id. ¶ 229. In other words, there are no jobs available to Mr. Dillon.

The court may affirm, modify, or reverse the Commissioner's decision, with or without remand to the Commissioner for a rehearing. 42 U.S.C. § 409(g). If the court determines that the "record overwhelmingly supports a disability finding and remand would merely delay the receipt of benefits to which the plaintiff is entitled, reversal is appropriate." Thompson v. Sullivan, 957 F.2d 611, 614 (8th Cir. 1992). Remand to the Commissioner is neither necessary nor appropriate in this case. The Commissioner's own final witness resolves this case in favor of claimant. Mr. Dillon is disabled and entitled to benefits. Reversal is the appropriate remedy at this juncture. Thompson, supra.

## ORDER

Based on the above analysis, it is

ORDERED that plaintiff's motion (Docket 16) is granted and the decision of the Commissioner of November 21, 2013, is reversed and the case is remanded to the Commissioner for the purpose of calculating and awarding benefits to the plaintiff James Dillon.

Dated September 26, 2016.

BY THE COURT:

/s/ *Jeffrey L. Viken*

JEFFREY L. VIKEN
CHIEF JUDGE